Miclat.COM

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortes
Hagåtña, Guam 96910
PHONE: (671) 472—7332
FAX: (671) 472—7334

Attorneys for the United States of America

**FILED**
DISTRICT COURT OF GUAM
MAR 30 2007
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310,<br><br>UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-B207,<br><br>UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1,<br><br>LOT NO. 2-2, TRACT NO. 2022, MUNICIPALITY OF ASAN/PITI, GUAM, and<br><br>LOT NO. 19-1, TRACT NO. 292, MUNICIPALITY OF YIGO, GUAM,<br><br>Defendants. | CIVIL CASE NO. 07-00006<br><br>**VERIFIED COMPLAINT OF FORFEITURE** |

Now comes plaintiff, the United States of America, by and through its attorneys, Leonardo M. Rapadas, United States Attorney for the District of Guam, and Karon V. Johnson,

-1-

Assistant United States Attorney, and respectfully states as follows:

1. This is a civil action in rem brought to enforce the provision of 18 U.S.C. §§ 981(a)(1)(C), 1956(a)(1)(A)(i), and 1961(1), for the forfeiture of the above-listed five pieces of realty, which realty constitute and are derived from proceeds traceable to violations of 9 Guam Code Annotated §§ 43.10 & 43.20, Felony Theft, Title 18, United States Code, § 1343, Wire Fraud, Title 18, United States Code, § 1344, Bank Fraud, and Title 18, United States Code, § 1956, Money Laundering.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. Venue is proper in this district pursuant to 28 U.S.C. § 1395(b) because the defendant res are located in this district.

3. The defendants are realty described as UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310; UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW- B207; UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1; LOT NO. 2-2, TRACT NO. 2022, MUNICIPALITY OF ASAN/PITI, GUAM; and LOT NO. 19-1, TRACT NO. 292, MUNICIPALITY OF YIGO, GUAM.

4. The facts and circumstances supporting the seizure and forfeiture of the defendants UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310; UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-B207; UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1; LOT NO. 2-2, TRACT NO. 2022, MUNICIPALITY OF ASAN/PITI, GUAM; and LOT NO. 19-1, TRACT NO. 292, MUNICIPALITY OF YIGO, GUAM,.are contained in the Declaration of FBI Special Agent Kenneth Klocke, attached hereto and incorporated herein as Exhibit A.

6. The defendants UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310; UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW- B207; UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1; LOT NO. 2-

2, TRACT NO. 2022, MUNICIPALITY OF ASAN/PITI, GUAM; and LOT NO. 19-1, TRACT NO. 292, MUNICIPALITY OF YIGO, GUAM, constitute proceeds traceable to violations of 9 Guam Code Annotated §§ 43.10 & 43.20, Felony Theft, Title 18, United States Code, § 1343, Wire Fraud, Title 18, United States Code, § 1344, Bank Fraud, and Title 18, United States Code, § 1956, Money Laundering, and are, therefore, subject to forfeiture to the United States pursuant to Title 18, United States Code, § 981(a)(1)(C).

**WHEREFORE**, the United States of America prays that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant real properties described as UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310; UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW- B207; UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1; LOT NO. 2-2, TRACT NO. 2022, MUNICIPALITY OF ASAN/PITI, GUAM; and LOT NO. 19-1, TRACT NO. 292, MUNICIPALITY OF YIGO, GUAM, to be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 29th day of March, 2007.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: *(signed)*
KARON V. JOHNSON
Assistant U.S. Attorney

# DECLARATION OF KENNETH KLOCKE

I, KENNETH KLOCKE, being first duly sworn, do depose and say:

1. I am a Special Agent of the Federal Bureau of Investigation and make this affidavit in the course of my official duties. I make this complaint based on my personal knowledge and on information furnished to me by other law enforcement personnel.

2. I am currently investigating Information and Data Services (IDS), a payroll processing company doing business on Guam and Saipan. IDS provided employee payroll processing services to numerous small businesses and multi-national corporations. The majority of client businesses would give IDS money equal to their total payroll. IDS in turn would make electronic transfers to the individual client employees and withhold FICA, payroll taxes and income taxes, which IDS would pay on a weekly basis to the Internal Revenue Service and Guam Department of Revenue and Taxation. The client's raw data for each payroll period would be electronically transferred to IDS, which in turn would transfer the raw data to Ceridian Employers Services, whose regional office is in Honolulu, Hawaii In turn, Ceridian would process the data, determine the appropriate payments to be withheld in each category, generate a payroll register, and calculate the processing fees owed IDS and Ceridian. The client would be notified by IDS of the total sum owed, to include net pay, withholdings, and processing fees. The monies from the client businesses would be paid to IDS either by a check drawn on the client's account, or by electronic transfer from the client's bank account into IDS accounts at either the Bank of Guam, Citizens Security Bank, Bank of Hawaii and First Hawaiian Bank. IDS had accounts in each bank primarily due to their client banking relationships. IDS charged each client processing fees for providing these payroll and payroll tax services.

3. IDS was incorporated November 7, 1995, as JALE Management Information Services, dba Information and Data Services. Romy M. Miclat (Miclat) is listed as the president. Miclat and his wife Aniceta C. Miclat own 9,900 of the 10,000 common shares of the corporation. It has been continuously in business since that time.

-4-

Exhibit A

Case 1:07-cv-00006   Document 1   Filed 03/30/2007   Page 4 of 9

4. On October 11, 2006, the FBI was contacted by Brian Ishikawa, Vice President, Director of Corporate Security, Bank of Hawaii. I personally talked to Mr. Ishikawa, who told me that Romy Miclat contacted the Bank of Hawaii on October 4, 2006, and advised that the accounts at Bank of Hawaii would be overdrawn in the amount of $200,000 by the end of the business day. Mr. Ishikawa advised that on October 5, 2006, the IDS Bank of Hawaii accounts were overdrawn in the amount of $600,000. Mr. Ishikawa advised that IDS had at least five checking accounts at the Bank of Hawaii. IDS used the accounts to collect money from clients, pay fees, pay taxes, issue manual checks and other IDS related business.

5. On October 11, 2006, I and other FBI agents executed a search warrant at IDS headquarters at 202 Farenholt Avenue, Suite 242, Oka Plaza Building, Tamuning, Guam. At that time we seized business records and computers. I have reviewed the non-computerized records which were seized. They reflect that on October 2, 2006, IDS created $1.6 million in cash that did not exist. IDS wrote or completed a total of nine electronic transfers drawn on the Bank of Hawaii and deposited the checks and electronic transfers into IDS Bank of Guam accounts. The same day, IDS prepared 18 checks, dated October 3, 2006, drawn on the Bank of Guam, and deposited the 18 checks into one of the IDS Bank of Hawaii accounts on October 3, 2006. I am familiar with this scheme, which is known as check kiting. It involves the use of the "float," which is the time between which a check is deposited and when the check clears the financial institution from which it is drawn. For example, concerning this particular series of transactions, on October 2, 2006, and thereafter, IDS made nine deposits to the Bank of Guam accounts totaling approximately $1.6 million. Bank of Guam presented the checks for payment or credit to Bank of Hawaii on October 3, 2006. On October 3, 2006, IDS deposited 18 checks drawn on the Bank of Guam, to an IDS account at the Bank of Hawaii. The 18 checks totaled exactly the same amount as the 9 checks and electronic transfers deposited on October 2, 2006, at the Bank of Guam. On October 3, 2006, the 18 checks (deposits/credits) offset the nine checks and electronic transfers (debits) in a IDS account at the Bank of Hawaii. On October 5, 2006, Bank

-5-

of Hawaii presented the 18 checks to Bank of Guam for payment or credit. As a result, IDS received $1.6 million credit in their Bank of Guam account for two days, through use of these kiting transfers. If this have been the only occurrence, the kiting would have been discovered in two days. IDS, however, continuously made transfers day after day, so that the kite would not be detected. My review of IDS banking records reflects that this kiting scheme has been ongoing since at least 2001. These fraudulent transfers were commingled with legitimate transfers as well. This scheme involved two kinds of floats. One float was the one-day transfers between Bank of Hawaii and Bank of Guam. The other float could be as much as a week, depending on how long it took the clients' employees to deposit or cash their payroll checks.

6. My analysis to date reflects that the reason these check kiting schemes were initiated and continued was to conceal that fact that IDS was taking more of the clients' monies than it was entitled to from its earned processing fees.

7. I have interviewed Josephine Mariano, Vice President, Branch and Central Operations Administrator, Bank of Guam. She told me that she met with Romy Miclat sometime in August, 2006, to discuss the unusual number of unnecessary transfers between the various IDS bank accounts. Miclat told her that the large check transfers between Bank of Guam and Bank of Hawaii were due to IDS paying payroll taxes for IDS clients.

8. Ms. Mariano told me that on October 3, 2006, she visited the IDS office and spoke to Fe Dulay, IDS controller,.and Gil Miclat, IDS manager. Ms. Mariano brought in 3-4 days of processed IDS checks and asked what was going on? Gil Miclat told her that IDS had started a computer company which was fronting payroll to clients, i.e., processing payroll prior to the clients' deposits. Gil Miclat said that the clients subsequently paid IDS the full amount owing plus a premium, so there was nothing fraudulent about the transfers. Ms. Mariano accused them of kiting checks between Bank of Guam and Bank of Hawaii, and instructed them not to issue any more transfer checks drawn on Bank of Guam.

9. Ms. Mariano told me that on October 4, 2006, Romy Miclat came to her office and

-6-

admitted to her that he was using floats to finance other businesses, and that the floats were "in the millions." Ms. Mariano told Miclat that this was against the law, and he acknowledged that he knew this. Miclat asked her for more time, and she declined. Bank of Guam put a freeze on the IDS accounts and put stop payments on the checks from Bank of Guam to Bank of Hawaii.

10. My analysis of the IDS records reflects that Romy Miclat would make charges on his American Express credit cards, which were used to purchase items for another business, Comp-U-Biz, a corporation operated by his brother Gil Miclat. My review of the records seized from Miclat's office reflect that in fact Romy Miclat has significant influence over Comp-U-Biz and that the IDS comptroller, Fe Dulay, is an authorized signator on at least one of the Comp-U-Biz checking accounts. Romy Miclat used his American Express cards to purchase personal items for himself as well. IDS funds were used to pay off this credit card. By the end of 2006, IDS internal financial statements indicate that Romy Miclat had diverted over $300,000 in IDS funds to pay the charges against this credit card as well as cash advances to himself. This was identified as an account titled "Due from Romy Miclat" in the IDS general ledger.

11. I have reviewed 45 IDS checks (carbon copies) payable to Romy Miclat, labeled as Transfer Checks, which span the time from October 3, 2001 to December 20, 2002, but were not the entire number of Transfer Checks for the period. The total amount of the 45 checks was approximately $400,000. Many of the check copies were attached to e-mails, in support of the checks, in which Romy Miclat directed IDS employees to prepare the checks. I reviewed IDS checks payable to Comp-U-Biz which totaled $125,000 in 2001 and a $35,000 transfer from IDS to the Philippines via Metro Bank in 2001.

12. Based on a review of Romy Miclat's 1999 and 2000 tax returns, almost all of Miclat's income was derived from IDS. My review of the records reflect that, but for the continuous check kiting, the business would ceased to exist. I have examined loan documents from Wells Fargo Financial, Guam Inc., which reflect that on or about March 25, 2002, Romy Miclat borrowed $295,306.80 from Wells Fargo Financial. This loan is secured by five pieces

1 | of realty, which are the above-entitled defendant res. He is making monthly payments on this
2 | loan of approximately $3,500 per month.

3 |   13. Some of the e-mails I have reviewed reflect that Miclat caused his comptroller, Fe Dulay, to use IDS monies to pay his Wells Fargo loan. One of the ways would be by directing Dulay to make a false sale utilizing one of his American Express credit cards. This false sale would be used to generate cash, which was written against a COMPUBIZ account. Miclat would deposit that check into his personal bank account, and draw a check from that account to pay the Wells Fargo loan. When he received the American Express bill, he would direct Dulay to cut a check from one of the IDS accounts to cover the bill. Another method would be simply to direct Dulay to pay IDS monies into Miclat's personal account, which he in turn would use to pay Wells Fargo.

  14. Based on the above information, I have reason to believe that CONDOMINIUM UNIT H-310 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-H310; CONDOMINIUM UNIT B207 APUSENTO GARDEN, DESCRIBED AS LOT 3381-9NEW-NEW-B207; UNIT 307 VILLA PUNTAN ISA, DESCRIBED AS LOT 5370-3-1; TRACT OF LAND DESCRIBED AS T 292-L19-1; and TRACT OF LAND DESCRIBED AS T 2022-L2-2 constitute and are derived from proceeds traceable to violations of 9 Guam Code Annotated §§ 43.10 & 43.20, Felony Theft, Title 18, United States Code, § 1343, Wire Fraud, Title 18, United States Code, § 1344, Bank Fraud, and Title 18, United States Code, § 1956, Money

\\
\\
\\
\\
\\
\\
\\

Laundering, and are, therefore, subject to forfeiture to the United States pursuant to Title 18, United States Code, § 981(a)(1)(C).

FURTHER AFFIANT SAYETH NAUGHT.

_____
KENNETH KLOCKE
Special Agent, FBI

SUBSCRIBED AND SWORN TO BEFORE me on this _____ day of March, 2007.

_____
NOTARY PUBLIC

CARMELLETA Q. SAN NICOLAS
Notary Public
In and for Guam, U.S.A.
My Commission Expires: Aug. 15, 2010
Sirena Plaza, Ste. 500,
108 Hernan Cortez Avenue
Hagatna, Guam 96910